IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KIMBERLY-CLARK CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| MARCO QUERZOLI, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

1.      Plaintiff Kimberly-Clark Corporation ("Kimberly-Clark" or the "Company"), by its undersigned attorneys, hereby states its complaint for breach of contract, misappropriation of trade secrets and/or confidential information in violation of the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836(b)) ("DTSA") and the Delaware Uniform Trade Secrets Act (6 Del. C. § 2001 *et seq.*) ("DUTSA"), breach of the implied covenant of good faith and fair dealing, and fraudulent inducement against Defendant Marco Querzoli as follows:

## NATURE OF THE ACTION

2.      Kimberly-Clark brings this action against its former employee, Querzoli, for his flagrant contractual breaches, misappropriation, and fraud.  Querzoli worked for Kimberly-Clark for nearly 40 years.  And for nearly the past decade, he ran the Company's Europe, Middle East, and Africa ("EMEA") supply chain team out of the Company's main United Kingdom office. Querzoli was one of Kimberly-Clark's most senior employees.  He was privy to the Company's most significant trade secrets and confidential information and boasted that he has a photographic memory sufficient to capture and retain the Company's most sensitive details.

3.      In 2022, Querzoli entered into multiple non-competition agreements with Kimberly-Clark in consideration for valuable equity grants (the "Award Agreements").  These

Award Agreements limited Querzoli from working for a direct competitor for two years after leaving Kimberly-Clark.  Querzoli was also required to provide Kimberly-Clark with four months' notice before he left the Company.

4.     Despite these restrictions, in approximately January 2023, on information and belief, Querzoli started secretly negotiating an employment or engagement offer with one of Kimberly-Clark's direct competitors, Ontex Group NV (together with its affiliates, "Ontex").  Both Ontex and Kimberly-Clark manufacture and sell personal health and hygiene products worldwide. Over the past several years, too, Ontex has been aggressively poaching Kimberly-Clark's employees by luring them with oversized compensation packages and, on information and belief, expectations that they would reveal Kimberly-Clark's best-in-class processes and strategies to enable Ontex to unfairly compete against the Company.  For instance, in 2019, Ontex poached Kimberly-Clark's then-EMEA President and Querzoli's long-time manager, Gustavo Calvo Paz. Calvo Paz is now Ontex's Chief Executive Officer.

5.     Querzoli was a prime target for Ontex and Calvo Paz—not just because of Querzoli's longstanding career and senior management role with Kimberly-Clark, but also because he was widely known for his institutional recall and deep knowledge about the Company.  As a senior officer responsible for leading Kimberly-Clark's multicontinental supply chain operations, Querzoli had ready access to trade secrets and confidential information about, among other things, Company-wide capital expenditures, production processes, growth plans, markets of interest, and cost structures—information that constitutes the most valuable trade secrets a company in Kimberly-Clark's and Ontex's line of business can have.  As Calvo Paz well knew, Querzoli was all the more valuable to Ontex because his self-described photographic memory would allow him to recreate a repository of Kimberly-Clark's most sensitive secrets while Ontex employed him.

6.      On April 17, 2023, Querzoli told Kimberly-Clark that he wished to end his secondment from Italy to the United Kingdom before it was due to end in October 2023, and return home to Italy. Querzoli claimed he needed to urgently return to Italy for family reasons, including health issues in his family. His urgent request to leave Kimberly-Clark was surprising because Querzoli frequently remarked that he needed to remain with the Company for another three years to receive his full pension. Nevertheless, as a result of his request, Kimberly-Clark initiated discussions to negotiate a severance agreement through Querzoli's counsel. On June 14, 2023, however, Querzoli unexpectedly terminated those conversations and tendered his resignation, effective July 31, 2023.

7.      Given Querzoli's seniority, his access to the Company's most sensitive trade secrets and confidential information, and his renowned institutional knowledge, Kimberly-Clark was careful during the course of its discussions about Querzoli's future with the Company to ask him to confirm that he had not received any offer of employment or engagement that would breach the restrictive covenants in his Award Agreements. Kimberly-Clark asked that question multiple times. In response, Querzoli and his counsel represented that he had not received any offer of employment or engagement, let alone with a competitor.

8.      Taking Querzoli at his word that he was simply returning home to Italy for family reasons and not moving to a competitor in violation of his non-competition agreements, Kimberly-Clark did not require Querzoli to pay the Company the balance of his four-month notice period that had not concluded when he resigned on July 31, 2023.

9.      After duping Kimberly-Clark into this good-faith accommodation, Querzoli ignored the two years that remained on his non-competition agreements. He started work at Ontex on August 21, 2023, just three weeks after his 38-year career with the Company ended, ***in a role***

*substantially similar to the one he had served at Kimberly-Clark*—Chief Supply Chain Officer. Only later did Kimberly-Clark discover that Querzoli had searched for temporary lodging near Ontex's headquarters in Belgium as early as February 2023—more than four months before he represented to the Company that he had no offers of other employment or engagement.

10.    This is not the first time that Ontex has initiated this playbook—recruiting Kimberly-Clark's executives who are subject to non-competition agreements. When Calvo Paz left Kimberly-Clark, he *honored* his restrictive covenants and waited for their duration to expire before taking up employment with Ontex. Similarly, when Rodney Olsen (a current member of Ontex's Board of Directors) left his position as Kimberly-Clark's Chief Financial Officer for its Asia Pacific region, he *too* honored his restrictive covenants. Olsen actually asked Kimberly-Clark to waive a portion of his non-competition period. But when the Company declined—as was its right—he did the right thing and waited before joining Ontex and competing with Kimberly-Clark. Querzoli's refusal to follow in his now-colleagues' footsteps confirms the palpable unlawfulness of his actions as well as the reasonableness of the covenants' restrictions.

11.    Kimberly-Clark's attempts to avoid litigation have been met with stonewalling and outright refusals to answer simple questions about Querzoli's employment with Ontex. Querzoli has left Kimberly-Clark with no choice but to bring this action to enforce Querzoli's restrictive covenants, protect its confidential information and trade secrets from a direct competitor, and remedy the fraud and scheme Querzoli perpetrated to avoid paying the Company the outstanding portion of his notice period.

## PARTIES

12.    Plaintiff Kimberly-Clark is a Delaware corporation having its principal place of business at 351 Phelps Drive, Irving, Texas 75038.

13.    Defendant Querzoli is a natural person who, on information and belief, is domiciled in Italy.  From 1985 until July 31, 2023, Querzoli was an employee of Kimberly-Clark.  Beginning on September 1, 2014, Querzoli worked for Kimberly-Clark in the United Kingdom, on secondment from Italy, as Product Supply Vice President for the EMEA region, a senior management level role in which he had ready access to a wide range of trade secrets and highly confidential information.

### JURISDICTION AND VENUE

14.    This Court has subject-matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331, 1332(a)(2).

15.    This Court has personal jurisdiction over Querzoli pursuant to forum-selection clauses in his Award Agreements, through which Querzoli has irrevocably submitted to the exclusive jurisdiction of the federal courts located in the District of Delaware and the laws of the State of Delaware for the purpose of this dispute.  Those forum-selection clauses expressly provide that Querzoli "waives any objection to the exercise of personal jurisdiction" of "federal courts located in the District of Delaware."  Ex. 1 § 8; Ex. 2 § 8.  The forum-selection clauses apply to "any dispute arising out of or related to the Award or the Award Agreement," which includes both breaches of the non-competition covenants contained within the Award Agreements and Querzoli's related scheme to defraud Kimberly-Clark and misappropriate its confidential and trade secret information to facilitate his unlawful competition.  *Id.*

16.    Venue in this Court is proper because the parties contractually agreed that this Court would serve as the exclusive venue for this dispute.  Venue is also proper in this Court under 28 U.S.C. § 1391(c)(3) because Querzoli is not resident in the United States and may be sued in any

judicial district in the United States in which he is subject to the court's personal jurisdiction, including in this District.

## STATEMENT OF FACTS

**I.**   **Kimberly-Clark Corporation Is a Global Leader in Essential Health and Hygiene Products**

17.    Founded in 1872 and incorporated in Delaware, Kimberly-Clark has long been an essential source for personal health and hygiene products in the United States and worldwide. Kimberly-Clark's personal care brands provide customers with the tools they need to care for themselves and their families through a wide variety of innovative solutions and products such as disposable diapers, training and youth pants, swim pants, baby wipes, feminine and incontinence care products, and other related products.  Products in Kimberly-Clark's personal care segment are sold under the Huggies, Pull-Ups, Little Swimmers, GoodNites, DryNites, Sweety, Kotex, U by Kotex, Intimus, Thinx, Poise, Depend, Plenitud, Softex, and other brand names.  Kimberly-Clark's consumer tissue line of business includes ubiquitous and trusted brands like Kleenex, Scott, and Cottonelle.  The Company's professional segment helps workplaces stay healthy, safe, and productive through a range of products such as wipers, tissue, towels, apparel, soaps, and sanitizers.

18.    Kimberly-Clark employs approximately 44,000 employees.  Roughly 30 percent of the Company's employees are located in North America, and the remainder are in approximately 60 countries worldwide.  Kimberly-Clark employs more than 7,000 people in more than 50 office and manufacturing locations across EMEA.

**II.**   **Querzoli Works for 38 Years at Kimberly-Clark and Becomes Intimately Familiar with Confidential Information and Trade Secrets**

19.    Querzoli began working for Kimberly-Clark in Italy in 1985, just after graduating from the Università degli Studi di Torino in 1984.  From 2009 to 2012, he was the Family Care

Europe Manufacturing Director.  In 2012, he became the Country Manager and Managing Director for Kimberly-Clark's Italy operations.  And in 2014, he accepted the position of Product Supply Vice President for the EMEA region.  That was a high-ranking position.  Querzoli's manager in that role was the President for the EMEA region—formerly, Ontex CEO Calvo Paz, and currently, Doug Cunningham.  That person, in turn, reports to Kimberly-Clark's global Chief Executive Officer.

20.     Querzoli accepted this senior position by executing an Assignment Letter on January 8, 2014.  The Assignment Letter states: "you will remain an employee of Italy . . . any contractual dispute arising from your assignment will be handled in Italy and will be subject to Italy's legislation. . . . Should the assignment exceed 60 months, you may be transferred to host country terms and conditions."  Ex. 3.  Upon accepting this position, Querzoli was seconded from Italy to the United Kingdom, where he would live and work for Kimberly-Clark until he resigned effective July 31, 2023.

21.     In his Product Supply Vice President role, Querzoli was responsible for the Company's supply chain operations in the EMEA region.  The supply chain is one of the most important aspects of Kimberly-Clark's business.  It is critical to achieving the trademark consistency and dependability that has earned the Company its reputation as one of the most trusted product manufacturers in the world.  To that end, Kimberly-Clark has developed and uses proprietary and confidential supply methods and organizational structures that are trade secrets. These include quality control methods, manufacturing processes, ingredient and material lists, packaging and marketing strategies, business plans, and much more.  Querzoli's EMEA supply chain team of over 4,000 employees was responsible for the entire end-to-end production process, from sourcing materials, to making the products, to delivering them to customers.

22.     Kimberly-Clark has spent significant time and resources over many years protecting its confidential information and trade secrets.  By way of example, Kimberly-Clark has implemented physical security measures such as requiring authorization to tour Kimberly-Clark's mills and labs, electronic badge access, security cameras and guards, printing restrictions, and "Supervised Destruct" days to shred documents and materials.  Kimberly-Clark restricts computer access, regulates software and USB usage, strictly enforces a policy to classify and mark documents, restricts photography and video in manufacturing facilities, and requires that manufacturing drawings and product information be stored in access-restricted databases. Kimberly-Clark regularly conducts "Confidential Information Assessments" of its projects and facilities to ensure all sensitive information is adequately protected.

23.     All Kimberly-Clark personnel agree to the Company's Code of Conduct, which restricts the use of confidential Company information.  All personnel globally are required to attend annual training on the Code of Conduct, and Querzoli has attended that training since at least 2015.   Kimberly-Clark separately conducts confidentiality training for its employees (including Querzoli), and reminds employees of their ongoing confidentiality obligations when they leave the Company.  Employees sign employment agreements with strict confidentiality obligations, and those with high-level positions also enter into restrictive covenants—like those Querzoli agreed to in the Award Agreements.  Third parties engaging with Kimberly-Clark are required to enter into non-disclosure agreements too.  That includes third-party manufacturers that contract to produce certain products for Kimberly-Clark, like Ontex.

24.     During the 38 years that Querzoli worked for Kimberly-Clark, he had access to the Company's most important confidential information and trade secrets.  This included the Company's most confidential financial data, including profit and loss statements.  He had ready

access to sensitive procurement data including, but not limited to, highly confidential information concerning cost of goods and production, and he regularly attended senior-level global procurement meetings. He attended the Company's most sensitive strategy meetings, gaining highly valuable insight into the Company's global objectives and business plans, both current and future. He also regularly attended quarterly business review meetings with the Company's Chief Executive Officer and Chief Financial Officer to discuss the Company's EMEA business strategy. And because he has boasted about having a photographic memory, all of that information is still very much in his possession and accessible to him—and therefore Ontex—at any time.

### III.   Querzoli Voluntarily Accepts Non-Competes in Stock Award Agreements

25.   To attract and retain the best talent, Kimberly-Clark provides market-based competitive compensation through salary, annual incentive, and long-term incentive programs. Eligible employees are compensated for their contributions to the Company's goals with both short-term cash incentives and long-term equity-based incentives. In particular, Kimberly-Clark sometimes compensates its managerial employees who materially contribute to the success of the Company with opportunities to participate in Company ownership on beneficial terms. These usually come in the form of stock option awards or restricted stock units that vest after a certain time period or upon a certain performance milestone.

26.   Along with these equity grants, Kimberly-Clark will often require recipients to enter into certain restrictive covenants. The restrictive covenants are necessary because senior employees who typically receive equity grants are in a position to and do acquire highly confidential information and trade secrets that would be damaging to Kimberly-Clark if divulged to a competitor. These non-competition agreements are necessary to enforce employees' promises

not to divulge confidential information and trade secrets as well, because it is impossible to police that promise when they no longer work for the company where they acquired such information.

27.     Querzoli received exactly these types of equity grants and entered into exactly these types of restrictive covenants.  Specifically, in 2022, Kimberly-Clark and Querzoli executed two restricted stock unit award agreements dated April 26, 2022.  Each of these Award Agreements, which are attached to this Complaint as Exhibits 1 and 2 and incorporated by reference, includes a non-compete agreement restricting Querzoli from working for a similarly geographically situated competitor in the same or similar role for two years following the termination of his Kimberly-Clark employment.  The Award Agreements provide that:

> [D]uring the term of the Participant's employment and for a period of two (2) years following the termination of employment, regardless of the reason for or the manner of termination, the Participant shall not, without the written consent of General Counsel of the Corporation or his/her designee, in any country or countries for which Participant had development, marketing, innovation/technology (R&D), distribution, sales, administrative, operational/supply chain or manufacturing oversight responsibilities during the last two (2) years of Participant's employment or was provided with regular and material access to Confidential Information regarding the Corporation's or an Affiliate's business operations in that country or countries during the last two (2) years of Participant's employment, either directly or indirectly, perform duties or undertake responsibilities for a Competitor that are the same or substantially similar to those duties or responsibilities that the Participant performed or undertook for the Corporation or an Affiliate during the two (2) year period prior to the end of the Participant's employment with the Corporation or an Affiliate.

Ex. 1 § 20(c); Ex. 2 § 20(c).  The Award Agreements expressly conferred on Kimberly-Clark "sole discretion" to enforce the non-competition provisions contained therein, regardless of any "local restrictive covenants."  Ex. 1 § 20(a); Ex. 2 § 20(a).  The Award Agreements also have a Delaware choice of law and District of Delaware forum selection provision:

> Governing Law.  The Plan is governed by and subject to the laws of the United States of America.  All questions pertaining to the

construction, interpretation, regulation, validity and effect of the provisions of this Award and any rights under the Plan shall be determined in accordance with the laws of the State of Delaware and federal courts located in the District of Delaware shall be the exclusive forum for any dispute arising out of or related to the Award or the Award Agreement and the Participant consents to and waives any objection to the exercise of personal jurisdiction and venue by such courts.

Ex. 1 § 8; Ex. 2 § 8.  Finally, the Award Agreements require an employee who violates the non-competition provisions to reimburse Kimberly-Clark for "all its costs incurred" to enforce the Award Agreements.  Ex. 1 § 20(j); Ex. 2 § 20(j).  And they expressly acknowledge that if Querzoli breaches the restrictive covenants, "damages would not be an adequate remedy to compensate [Kimberly-Clark] for the harm to [its] business" and that Kimberly-Clark "shall be entitled to a temporary restraining order and to temporary injunctive relief to prevent or terminate such anticipated or actual breach."  Ex. 1 § 20(h); Ex. 2 § 20(h).

28.     On May 12, 2022, Querzoli knowingly and voluntarily accepted award grants pursuant to the Award Agreements.  As part of a three-step process to voluntarily accept these awards, Kimberly-Clark *twice* reminded Querzoli that the awards (which he was under no obligation to accept) were subject to his agreement to certain non-competition provisions and Kimberly-Clark's Compensation Recoupment Policy.  At the first step, when selecting the available grant he wished to accept, Querzoli was notified at the top of the page: "IMPORTANT – PLEASE NOTE: Kimberly-Clark Corporation's Long-Term Incentive Agreement contains non-competition and related provisions.  The agreement also requires all participants globally to acknowledge that you have reviewed and understand Kimberly-Clark Corporation's Compensation Recoupment Policy . . . Please review the grant agreement carefully before accepting the award."



When reviewing his grant on the next screen at step two of the voluntary acceptance process, Querzoli received the same notification at the top of the page.  Additionally, he had to—and did—affirmatively click "accept" to acknowledge that he had "read, underst[ood] and agree[d] to the terms and conditions of the 2021 Equity Participation Plan (the "Plan") [and]. . . the provisions of the applicable agreements and all other applicable documents."  Querzoli further "agree[d] that [his] participation in the Plan and the awards granted to [him] under the Plan will be governed solely by provisions of U.S. law."  The instructions also required Querzoli to view the Award Agreements and Recoupment Policy before accepting or rejecting any award.



At the last step, Querzoli confirmed and submitted his acceptance of the grants, subject to the Award Agreements and the non-competition provisions within them.



29.     Querzoli accepted the valuable Award Agreements and grant awards freely, knowingly, and voluntarily.  At all times before executing the Award Agreements he had a choice to decline them and avoid the non-competition and other clauses contained within them. Acceptance was not a condition of his employment, and he had approximately three months to review the Award Agreements and even to review them with counsel if he so desired.  And when he accepted the grant award pursuant to those Award Agreements weeks later, Querzoli unequivocally acknowledged that he had read, understood, and agreed to his obligations under the Award Agreements, including the non-competition provisions governed by U.S. law.

**IV.     Ontex Is a Direct Competitor of Kimberly-Clark**

30.     Ontex is an international personal hygiene products group that develops, produces, and supplies personal hygiene products and solutions to partner brands and healthcare providers in baby, feminine, and adult care in more than 110 markets around the world.  The company has production plants and offices in Europe, the Americas, the Middle East, Africa, Asia, and Australia.  A simple review of the companies' websites makes it clear that Ontex and Kimberly-Clark compete to sell similar products in identical markets:

14





Ontex's 2022 Annual Report even describes Kimberly-Clark as one of its five "peer" firms:



Ex. 4 at 245.

31.    In addition to competing for customers and market share, Kimberly-Clark and Ontex compete for talent.  In April 2021, Ontex added two former high-level Kimberly-Clark executives to its Board of Directors.  First, it hired Rodney G. Olsen, who was Kimberly-Clark's former Chief Financial Officer for the Asia-Pacific Division.  Then, it hired Calvo Paz, who was Kimberly-Clark's former EMEA President and Querzoli's former manager.  In November 2022, Ontex appointed Calvo Paz to be its CEO.  The list of Kimberly-Clark veterans Ontex has recently hired also includes Jeff Poulter, who joined Ontex in 2019 after working nearly 20 years for Kimberly-Clark and now is Ontex's Commercial Director, and Diego Alsua, who had worked

closely with Querzoli in the capacity of Senior Supply Chain Director in Kimberly-Clark's EMEA region.  Ontex recruited Alsua in 2023.

32.      Like Querzoli, Olsen and Calvo Paz both had agreements with Kimberly-Clark that contained restrictive covenants.  Olsen's non-compete was two years in duration and prohibited him from performing substantially similar responsibilities for a competitor in the United States or in any country for which he had responsibilities during the last 12 months of his employment with the Company.  Calvo Paz's non-compete was one year in duration and prohibited him from performing substantially similar responsibilities for a competitor in the United Kingdom, Czech Republic, Israel, Russian Federation, or South Africa.  Unlike Querzoli, Olsen and Calvo Paz honored their contractual obligations:  Both waited until after the expiration of their non-competes before joining Ontex.  In fact, Olsen even asked Kimberly-Clark if the Company would waive a portion of his non-competition period to allow him to consult for Ontex.  Kimberly-Clark declined, as was its right, and Olsen abided by his restrictions, waiting to join Ontex until after his non-competition period concluded.

33.      Ontex and Querzoli apparently learned a lesson from Olsen's case:  Rather than ask for permission and seek a waiver of the non-competes, they would engage in unlawful conduct, lie, and deceive, hoping one day to seek forgiveness from a judge and jury.

**V.    Querzoli Resigns from Kimberly-Clark, Lies About the Reason for His Resignation, Secretly Joins Ontex, and Refuses to Honor His Obligations Under the Award Agreements**

34.      By early 2023, Querzoli had been living in the United Kingdom working for Kimberly-Clark there for nearly a decade.  His performance had been effective, and Kimberly-Clark wanted to extend his secondment to the United Kingdom beyond October 2023, when the then-current arrangement was due to expire.  On or about February 28, 2023, however, Querzoli told Ian Flemington, Vice President of Human Resources for the EMEA region, that his

secondment was due to be reviewed and that he would want to renegotiate certain terms of his secondment benefits.

35.     On April 17, Querzoli told Cunningham that he wanted to leave Kimberly-Clark. This was surprising to the Company because Querzoli frequently talked about how long he would need to stay at the Company to receive his full pension, and he was only three years away.

36.     On May 3, Cunningham and Flemington had an in-person meeting with Querzoli. Querzoli told them that he wanted to leave the Company effective no later than June 30.  When Cunningham asked Querzoli why he wanted to leave the Company before his secondment to the United Kingdom ended in October, Querzoli said that he wanted to return to Italy for family reasons.  Cunningham told him that it was not feasible for him to leave the Company in June and reminded him that he was required to remain on secondment to the United Kingdom until October and that he was, in any case, subject to a four-month notice period.  If Querzoli failed to give four months' notice, then he must pay Kimberly-Clark the amount that he would have been paid in salary during the period of notice not complied with.  Querzoli's proposal that he leave the Company in June would violate the secondment agreement and the notice-period obligation and result in his owing the Company multiple months' salary.

37.     When the topic of potential severance pay arose, Cunningham told Querzoli that he did not want to request a favorable severance arrangement from Michael Hsu, the Company's Chief Executive Officer, only for Querzoli to immediately be hired somewhere else.  Querzoli assured Cunningham that he did not have a job waiting for him; he maintained that he simply wanted to go back to Italy for family reasons.  The next week, Querzoli communicated that he would be willing to leave the Company in July.

38.     The Company then began discussing potential terms of Querzoli's severance with him through letters, via his counsel.  In the early stages of these exchanges, Querzoli remained steadfast that he simply wanted to leave the Company to return home to Italy.  His tune changed, however, in the ensuing weeks.  Rather than simply state that he wanted to return to Italy, Querzoli started to tell colleagues that he wanted to return to Italy and would then reassess his job situation in September.

39.     Throughout these discussions, Flemington had numerous in-person and verbal conversations with Querzoli in an attempt to resolve outstanding issues between the legal teams.

40.     On June 14, Querzoli unexpectedly terminated the severance negotiations with the Company and tendered his resignation, effective July 31, 2023.  That July 31 effective date violated his obligation to give the Company four months' notice prior to resignation.

41.     After Querzoli tendered his resignation, Kimberly-Clark continued to ask him to confirm that he had not received any offer of employment or engagement that would breach his restrictive covenants with Kimberly-Clark.  On July 7, 2023, Querzoli's counsel unequivocally represented to the Company that Querzoli had not received any offer of employment or engagement.  Ex. 5.  At no time during these severance negotiations or otherwise did Kimberly-Clark ever suggest that it was waiving, or would not enforce, his non-compete or any other restrictive covenants under the Award Agreements.

42.     On July 14, Flemington met with Querzoli to conduct his exit checklist.  Querzoli was required to return any Company property, including equipment and documents, still in his possession or under his control at this meeting.  He returned his Company laptop, iPhone, iPad, car, credit card, and a single document.  When Flemington noted with surprise that Querzoli apparently possessed only one Company document after 38 years of employment, Querzoli said

that he didn't have any others—they were in a cabinet at the Company's United Kingdom office that his assistant managed—and that, regardless, returning documents did not matter because he has a photographic memory.

43.     By resigning, Querzoli left almost USD $1 million in various potential benefits from the severance negotiations behind.  He claimed that he walked away from this money because he wanted a simpler exit so that he could spend time in Italy with his family.  Confused by Querzoli's explanation, Flemington asked Company colleagues who might know specifics around his reasons for resigning, but no one gave him any further information.  No one at Kimberly-Clark suspected that Querzoli would ignore his contractual obligations and join a competitor after resigning.

44.     Kimberly-Clark has since learned that Querzoli's representations were false, or at the very least misleading, when made.  On February 27, 2023, Querzoli emailed himself a link to temporary housing in Aalst, Belgium from his Company email address.  Ex. 6.  Aalst is a midsized city in East Flanders.  It has been the location of Ontex's headquarters since 2014.  On information and belief, Querzoli had no other reason to be inquiring about temporary housing in Aalst but for preparing to work for Ontex.  He had no holiday planned there, no family residing there, and no other plausible reason to visit that city.  Tellingly, too, Querzoli did not limit his search to a simple Airbnb or VRBO for a short trip.  Rather, the link he sent himself was for three-bedroom houses in Aalst with a kitchen set-up and a garden—a home, not a holiday get-away; for example:



Querzoli had sent himself this link shortly before he told Kimberly-Clark that he wanted to leave the Company to return home to Italy—not Aalst—and long before he represented that he had no offers of employment or engagement with any Kimberly-Clark competitors, including his counsel's representation in July 2023.

45.     Relying on Querzoli's repeated representations that he had not received any offer of employment or engagement and that he was resigning for personal reasons, the Company did not require Querzoli to pay the Company the two-and-a-half-month balance of his four-month notice period that he did not work.  Querzoli's resignation was effective July 31, 2023.  Had the Company even considered that Querzoli would join a competitor in violation of the Award Agreements shortly after his resignation, it would not have released him from his obligation to indemnify it for the significant portion of the notice period he would not serve.

46.     On August 21, 2023, Querzoli notified Kimberly-Clark that he had started employment with Ontex that same day as a member of Ontex's Executive Committee and Chief

Supply Chain Officer.  Ex. 7.  Although the Award Agreement required him to give such notice "prior to accepting new employment," Ex. 1 § 20(d); Ex. 2 § 20(d), he provided that notice only after he had accepted the Ontex job and on his very first day.  His new job is substantially similar to his decade-long position managing Kimberly-Clark's EMEA supply chain.

47.     On August 29, 2023, Kimberly-Clark sent a "notice of default" to Ontex providing formal notice of Querzoli's non-compete and confidentiality obligations under the Award Agreements.  Ex. 8.  Despite the fact that its current CEO and a member of its Board of Directors had previously *honored* Kimberly-Clark's restrictive covenants, Ontex responded on September 5, 2023, asserting that Ontex did not believe that Querzoli was violating any restrictive covenants owed to Kimberly-Clark.  Ex. 9.  Ontex refused to confirm whether Querzoli had disclosed any of Kimberly-Clark's trade secrets or confidential information.  *Id.*  Instead, dodging the issue, Ontex cited only its *de jure* policies generally prohibiting the disclosure of third parties' proprietary information and use of third parties' intellectual property without their consent.  *Id.*

48.     On September 27, 2023, Kimberly-Clark sent a letter to Querzoli reminding him of his contractual confidentiality and non-competition obligations.  Ex. 10.  Kimberly-Clark further demanded that Querzoli answer certain questions concerning the facts and circumstances relating to his departure from the Company and subsequent employment by Ontex.  *Id.*  The parties exchanged a series of letters back and forth and met and conferred through counsel on the phone.  Querzoli refused to come into compliance with his restrictive covenants in the Award Agreements.  He refused to answer simple questions about his role at Ontex, to resign from Ontex, or to transfer to a job at Ontex that does not violate his non-compete.

**VI.    If Querzoli Is Permitted to Continue Employment at Ontex, the Harm to Kimberly-Clark Will Be Severe and Irreparable**

49.    Querzoli's employment at Ontex has already caused Kimberly-Clark to face competitive disadvantage.  By Ontex's own admission, Ontex is one of Kimberly-Clark's key competitors, jockeying for the Company's contracts and talent.  Ontex has clear motive and now opportunity to take advantage of Querzoli's information about Kimberly-Clark's strategy and capabilities.  And given the commonality of his roles at Kimberly-Clark and Ontex, it would be near-impossible for Querzoli to serve as Ontex's Chief Supply Chain Officer without using the confidential information and trade secrets he absorbed at Kimberly-Clark.  It is therefore inevitable that Querzoli will use Kimberly-Clark's trade secrets and confidential information—the material he committed to his photographic memory over 38 years at the Company—to do his new job.  Such use and disclosure pose a unique harm to Kimberly-Clark.

50.    Querzoli and Ontex both know that Querzoli's employment at Ontex violates his contractual agreements and violates the law.  In fact, they have taken great pains to try to hide information about his new position.  As of October 30, 2023, Querzoli had not updated his LinkedIn profile with his Ontex employment and continued to suggest he works for Kimberly-Clark in his LinkedIn "Headline."  Ex. 11.  Ontex did not publicly announce Querzoli's hire until on or about October 30, 2023, and only after Kimberly-Clark noted the omission in its October 16 correspondence, further evidencing Querzoli's and Ontex's consciousness of guilt.

**COUNT I – Breach of Contract: Violation of Award Agreements**

51.    Kimberly-Clark repeats and realleges the foregoing paragraphs as if fully set forth herein.

52.    Querzoli executed multiple contracts that remain valid and enforceable agreements—the Award Agreements.  Kimberly-Clark has performed all of its obligations under

23

those agreements.  As a key part of those agreements, Querzoli agreed to valid, enforceable, and binding non-competition covenants, which protect Kimberly-Clark's legitimate business interests and which are reasonable in time and scope.

53.    By working for a direct competitor almost immediately after resigning from Kimberly-Clark, Querzoli flagrantly and transparently breached his restrictive covenants set forth in the Award Agreements.  Querzoli's new employer, Ontex, is a global leader in the personal care and hygiene products industry that competes directly with Kimberly-Clark.  And Querzoli is serving Ontex in a role that is the same or substantially similar to the role he held at Kimberly-Clark for nearly a decade.  Every day Querzoli continues to work at Ontex is a day in which he continues to be in breach of the Award Agreements.

54.    Querzoli has already caused damage to Kimberly-Clark by virtue of his having worked for Ontex.

55.    Querzoli is also causing and will continue to cause irreparable harm to Kimberly-Clark.

**COUNT II – Breach of the Implied Covenant of Good Faith and Fair Dealing**

56.    Kimberly-Clark repeats and realleges the foregoing paragraphs as if fully set forth herein.

57.    Querzoli has breached the covenant of good faith and fair dealing implied in the Award Agreements, by which Querzoli promised that he would deal with Kimberly-Clark fairly, honestly, and in good faith and would not act to deprive Kimberly-Clark of the benefits of the Award Agreements.

58.    Querzoli has breached this covenant of good faith and fair dealing by misleading Kimberly-Clark into believing that he would not almost immediately breach the non-compete

covenants. He repeatedly represented to Kimberly-Clark that he did not have any offers of employment or engagement, and no plans of employment or engagement beyond "reassessing" his career in September 2023, yet he had been researching temporary lodging near Ontex's headquarters in February 2023.

59.     As a direct and proximate result of Querzoli's breach of the implied covenant of good faith and fair dealing, Kimberly-Clark has been denied the right to receive the benefits of the Award Agreements and has suffered, and continues to suffer, injury, including damages, in addition to applicable interest, costs (including attorneys' fees), and other damages to which it is entitled.

### COUNT III – Fraudulent Inducement

60.     Kimberly-Clark repeats and realleges the foregoing paragraphs as if fully set forth herein.

61.     Querzoli knowingly, and with the intent to defraud, made or caused to be made to Kimberly-Clark misrepresentations of material fact, including but not limited to his and his counsel's representations that he had not been offered employment or engagement at a competitor of Kimberly-Clark.

62.     The misrepresentations were false and misleading at the time they were made.

63.     Querzoli and others acting on his behalf made those misrepresentations, or caused them to be made, with knowledge of their falsity or recklessly without regard for their truthfulness, with the intent to deceive Kimberly-Clark, with the intent to induce Kimberly-Clark to allow him to resign on more favorable terms than they were required to, and to cause Kimberly-Clark to waive its right to enforce payment by him of the two-and-a-half-month balance of his four-month notice period that he did not work.

64.     Kimberly-Clark reasonably relied to its detriment on Querzoli's misrepresentations in deciding not to enforce payment of the notice-period balance.  Kimberly-Clark would not have chosen to do so had it known the representations were false when made.  Querzoli knew this, which is why he deceived Kimberly-Clark by asserting himself and through his counsel that he had not been offered employment or engagement at a competitor.

65.     Querzoli's deception caused Kimberly-Clark direct financial harm.  As a direct and proximate result of Querzoli's fraudulent inducement, Kimberly-Clark has been tricked into relinquishing its legal rights and has suffered, and continues to suffer, injury, including damages, in addition to applicable interest, costs (including attorneys' fees), and other damages to which it is entitled.

### COUNT IV – Misappropriation of Trade Secrets and/or Confidential Information in Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836)

66.     Kimberly-Clark repeats and realleges the foregoing paragraphs as if fully set forth herein.

67.     In his nearly 10 years managing Kimberly-Clark's EMEA supply chain, Querzoli had access to the Company's most important confidential information and trade secrets.  This included the Company's most confidential financial and procurement data.  He regularly attended senior-level global meetings and has knowledge of the Company's current and future global business plans and strategy.  He knows details about, among other things, the Company's capital expenditures, production processes, growth plans, markets of interest, cost structures, advertising, and consumer-promotion strategy.   And he has specific and significant knowledge about the Company's capabilities, efforts, and future plans to expand in emerging markets.  Querzoli is still in possession of all of this information by virtue of his photographic memory.  This information

constitutes protectable trade secrets owned by Kimberly-Clark under the definition of 18 U.S.C. § 1839(3).

68.     While employed as Ontex's Chief Supply Chain Officer and member of its Executive Committee, Querzoli will inevitably disclose Kimberly-Clark's trade secrets and/or confidential information for his own benefit and for the benefit of Ontex—where he performs essentially the same role he had at Kimberly-Clark.   Kimberly-Clark and Ontex are direct competitors—or in Ontex's words, "peers"—providing the same or very similar products in the same or very similar markets.  The Kimberly-Clark trade secrets and confidential information in Querzoli's possession are highly valuable to both companies, particularly given the nature of their line of business.

69.     Kimberly-Clark has spent decades and millions of dollars developing these trade secrets and confidential information, and Querzoli has spent nearly four decades absorbing them with his photographic memory.  Kimberly-Clark has taken significant protective measures to guard the secrecy and confidentiality of the trade secrets and confidential information in Querzoli's possession that he will inevitably use and disclose while employed by Ontex including, but not limited to, by using confidentiality, non-disclosure, and non-compete agreements, confidentiality policies and training for all employees, and physical and electronic security measures.

70.     Kimberly-Clark will be damaged as an unavoidable result of Querzoli's use and disclosure of its confidential information and trade secrets to Ontex.

## COUNT V – Misappropriation of Trade Secrets and/or Confidential Information in Violation of Delaware Uniform Trade Secrets Act (6 Del. C. § 2001 *et seq.*)

71.     Kimberly-Clark repeats and realleges the foregoing paragraphs as if fully set forth herein.

Case 1:23-cv-01235-UNA   Document 1   Filed 10/30/23   Page 28 of 30 PageID #: 28

72.     In his nearly 10 years managing Kimberly-Clark's EMEA supply chain, Querzoli had access to the Company's most important confidential information and trade secrets. This included the Company's most confidential financial and procurement data. He regularly attended senior-level global procurement meetings, and has knowledge of the Company's current and future global business plans and strategy. He knows details about, among other things, the Company's capital expenditures, production processes, growth plans, markets of interest, cost structures, advertising, and consumer-promotion strategy. And he has specific and significant knowledge about the Company's capabilities, efforts, and future plans to expand in emerging markets. Querzoli is still in possession of all of this information by virtue of his photographic memory. This information constitutes protectable trade secrets owned by Kimberly-Clark under the definition of 6 Del. C. § 2001(4).

73.     While employed as Ontex's Chief Supply Chain Officer and member of its Executive Committee, Querzoli will inevitably disclose Kimberly-Clark's trade secrets and/or confidential information for his own benefit and for the benefit of Ontex—where he performs essentially the same role he had at Kimberly-Clark. Kimberly-Clark and Ontex are direct competitors—or in Ontex's words, "peers"—providing the same or very similar products in the same or very similar markets. The Kimberly-Clark trade secrets and confidential information in Querzoli's possession are highly valuable to both companies, particularly given the nature of their line of business.

74.     Kimberly-Clark has spent decades and millions of dollars developing these trade secrets, and Querzoli has spent nearly four decades absorbing them. Kimberly-Clark has taken significant protective measures to guard the secrecy and confidentiality of the trade secrets in Querzoli's possession that he will inevitably use and disclose while employed by Ontex including,

but not limited to, by using confidentiality, non-disclosure, and non-compete agreements, confidentiality policies and training for all employees, and physical and electronic security measures.

75.     Kimberly-Clark will be damaged as an unavoidable result of Querzoli's use and disclosure of its confidential information and trade secrets to Ontex.

## **PRAYER FOR RELIEF**

76.     WHEREFORE, Kimberly-Clark respectfully requests that the Court enter an order and judgment against Querzoli as follows:

A)      Awarding Kimberly-Clark preliminary and permanent injunctive relief, including but not limited to: enjoining Querzoli from violating the Award Agreements by continuing his employment with Ontex or otherwise providing prohibited services to Ontex for the period of time required by the Award Agreements, subject to tolling for his breaching conduct; and enjoining Querzoli from using and/or disclosing Kimberly-Clark's confidential information and trade secrets in violation of the Award Agreements;

B)      Awarding Kimberly-Clark actual and compensatory damages in an amount to be determined at trial, including costs, fees, pre- and post-judgment interest;

C)      Awarding Kimberly-Clark its costs, expenses, and reasonable attorneys' fees;

D)      Awarding Kimberly-Clark punitive damages; and

E)      Awarding Kimberly-Clark such further and other relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

77.     Kimberly-Clark hereby demands a jury trial.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

OF COUNSEL:

Harris Mufson
Lee R. Crain
Hayley Fritchie
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

David Rubin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
(202) 955-8500

October 30, 2023

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Kimberly-Clark
Corporation*